Filed 8/8/13  P. v. Silva CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B239340 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA062814) |
| v. | |
| ALEX DA SILVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Alex Da Silva appeals from the judgment entered upon his jury conviction of forcible rape (Pen. Code § 261, subd.(a)(2))[1] of one victim and assault with intent to commit rape (§ 220) of another. He raises numerous issues, none of which warrants reversal of the judgment. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Defendant, a salsa dancing champion of some television fame, taught dance classes. In 2010, he was charged with four counts of forcible rape, two counts of assault with intent to commit rape, sodomy or oral copulation, and two counts of sexual penetration by a foreign object as to four different victims he met at salsa dance clubs. A jury found defendant guilty of assault with intent to commit rape as to victim J.T. (count 6) and of forcible rape as to victim P.D. (count 7). Defendant was sentenced to a six-year term on count 7 and a consecutive four-year term on count 6. He was ordered to pay various fines and fees, including a $2,000 restitution fine under section 1202.4, subdivision (b).

Since only counts 6 and 7 are at issue in this appeal, our summary is limited to evidence pertinent to those counts.

*1. Forcible Rape of P.D.*

P.D. took dance classes with defendant in 2002. In August of that year, she agreed to go to dinner with him. They ended up going to his house, where at some point he pushed her against a couch and started kissing her. She repeatedly protested, and he eventually stopped and gave her a ride back home.

The next day, P.D. accompanied defendant while he ran errands. They again ended up at his house, and P.D. agreed to watch a movie in his bedroom. She did not object when he removed his clothes and remained in his underwear. At some point during the movie, defendant pushed P.D. down on the bed and pinned her down with his body weight. She lay rigid, did not reciprocate, and tried to hold on to her underwear.

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

Defendant pushed it to the side and penetrated her vagina. She noticed that he was wearing a condom. After he finished, defendant told P.D. he had to attend an audition, got ready, and left the house. P.D. remained on the bed until defendant returned and gave her a ride back home.

After three weeks of no contact with defendant, P.D. again took one of his classes. Once again, she agreed to go to defendant's house, where he started kissing her and invited her to watch a movie in his bedroom. She declined, called a taxi, and went home. Some time later in 2002, defendant called P.D. on the telephone and asked her to book a flight for him on the internet. She obliged. In 2005, P.D. told her boyfriend that defendant had raped her; she reported the rape to police in 2009.

At trial, P.D. offered the following explanation for her behavior: her sisters and she had seen defendant on TV and were "starstruck." P.D. was attracted to defendant but did not feel ready to have sex with him. After he raped her, she remained in his house because she was in shock and wanted to pretend the rape did not happen. She went back to defendant's class because she did not want to accept that defendant was a "bad guy" and a rapist. P.D. liked defendant and even considered "just get[ting] past" this incident if he wanted to date her. She agreed to help him book a flight on the internet because her sister was excited defendant had called P.D., and P.D. did not want her to know what had happened. The jury convicted defendant of forcible rape, as charged.

*2. Assault with Intent to Commit Rape of J.T.*

J.T. took salsa classes with defendant in March 2009. After the first class, he invited her to take another class with him at a different venue. After the second class, she accompanied him to a deserted apartment, where he "came on to [her] aggressively," and they had sexual intercourse. A week later, after another class, she accompanied defendant to a different apartment, where, once again, they had sexual intercourse. Both times, she did not intend to engage in sexual relations with defendant, but did not resist his advances.

Two weeks later, after defendant had returned from a salsa congress in Arizona, J.T. told him she did not want to have sex with him any longer, and he promised they

3

would just have lunch together to celebrate his birthday. Defendant picked up food and took J.T. to the same deserted apartment to which he had taken her the first time. After they ate, defendant pushed J.T. down onto a couch. Although she tried to push him away and repeatedly said "no," he managed to move her underwear to the side and push his fingers into her vagina. He then pushed his penis against her. She noticed he had a condom on. J.T. continued to resist and eventually, after sucking on her breasts, defendant let her go home.

While driving home, J.T. called a friend and told him her dance instructor had "pinned her down and forced himself onto her." J.T. hesitated about reporting the incident to police because she was unsure if it was "serious enough." She did report it later that night and underwent a sexual assault examination. Defendant's DNA was found inside her bra. J.T. gave contradictory accounts as to whether defendant's penis penetrated her vagina. She told the nurse examiner that it had touched her only on the outside because she was trying to avoid penetration. At trial, she testified it had penetrated her "a little bit." As to J.T., the jury acquitted defendant of the rape charge but found him guilty of assault with intent to commit rape.

### 3. *Uncharged Rape of S.L.*

Evidence of an uncharged rape of S.L. was introduced at trial under Evidence Code section 1108. S.L. testified that in 2009 she attended a salsa congress in Arizona, where she participated in a workshop taught by defendant. He invited her to dinner, but instead they ended up at her house because defendant asked to use her computer. He eventually went into her bedroom, pulled her onto a bed, and started kissing her. She kissed him back but did not want to go any further and told him she wanted to return to the salsa congress. Defendant pinned her down and continued kissing her while she was trying to push him away. Although she protested, he put on a condom, pushed her underwear aside, and inserted his penis into her vagina. After he finished, they returned to the salsa congress, where S.L. told a friend that defendant had raped her. She reported the incident to police the next morning.

4

*4. Rape Trauma Expert's Testimony*

An expert in rape trauma testified to the ways in which acquaintance rape differs from stranger rape. The former does not involve significant force, and the victims commonly have a difficult time acknowledging that it has occurred. They tend to minimize, distort, deny or discount it, or they blame themselves. That is so because acquaintance rape conflicts with the core assumption that a person the victim has chosen to trust would not betray that trust.

The expert also testified there is "no universal response to trauma," but the common patterns of behavior are to freeze, flee, or fight. When victims of assault freeze in fright, disassociate, or shut down, they may not seem distressed at all. This reaction is the most difficult for others to understand.

## DISCUSSION

### I

Defendant challenges the sufficiency of the evidence supporting the forcible rape conviction on the ground that P.D.'s testimony was inherently improbable.

On appeal, we view the evidence in the light most favorable to the judgment and draw all reasonable inferences in its support. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness is sufficient to support a conviction, unless the testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) To be deemed improbable, testimony accepted by the trier of fact must be "'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.) The falsity of such testimony "'"must be apparent without resorting to inferences or deductions." [Citations.]'" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728.)

5

Cases finding inherent improbability are "so rare as to be almost nonexistent." (*People v. Ennis*, *supra*, 190 Cal.App.4th at p. 728.)  Defendant cites three such cases, all dating back to the 1940's and 1950's.  The cases are distinguishable.

In *People v. Casillas* (1943) 60 Cal.App.2d 785, the trial court convicted the defendant of raping his daughter.  (*Id.* at p. 793.)  On direct examination, the daughter testified her father had sexual intercourse with her twice.  On cross-examination, she recanted and accused a boy named Manuel instead.  On recross-examination, she testified her father and the boy each had sexual intercourse with her once.  (*Id.* at p. 792)  The appellate court reversed the conviction because the daughter had given "three separate, distinct and contradictory versions" of the facts, so that her testimony "was, in one part or another, perjurious." (*Id*. at p. 794.)  Defendant does not contend P.D.'s testimony was perjurious on its face, and the record does not indicate that she contradicted herself in any material way.

In *People v. Headlee* (1941) 18 Cal.2d 266, the defendant was charged with kidnapping two women and a taxi driver.  He also was charged with two counts of rape, based on his having sexual intercourse with one of the women, first in the taxicab and then in a motel, to which all four went.  (*Id*. at pp. 269–270.)  The jury convicted the defendant of kidnapping and rape in the motel room, but not in the taxicab.  The Supreme Court reversed, noting that to acquit the defendant of rape in the taxicab the jury must have found the act either did not occur or occurred with the victim's consent.  In either case, the jury could not reasonably believe the victim's testimony that she was raped in the motel room.  (*Id.* at pp. 274–275.)  In contrast, defendant's conviction of forcible rape as to P.D. was not inconsistent with his acquittal of the unrelated rape charge as to J.T. and with the jury's inability to reach a verdict on other unrelated charges of sexual assault as to other victims.

In *People v. Carvalho* (1952) 112 Cal.App.2d 482, the appellate court reversed the defendant's conviction of kidnapping his estranged wife while armed.  (*Id*. at p. 490.)  It held the wife's actions during the alleged kidnapping and in the month before she reported it did not show she was afraid of the defendant.  The court emphasized the many

6

opportunities the wife had to escape or ask for help while she drove the defendant from her house to his and then to a drive-in.  (*Ibid.*)  It also found significant the fact that, after the defendant had put the gun away, she had sexual intercourse with him and helped him bathe.  (*Ibid.*)

Defendant argues this case is similar to *People v. Carvalho* because, like the complainant in that case, P.D. either agreed to or tacitly acquiesced to defendant's actions, remained in his house after the alleged rape, had further contact with him, and delayed reporting the incident.  But, as defendant acknowledges, P.D. tried to hold onto her underwear during the alleged rape.  Thus, not all her actions are consistent with consent.  Additionally, P.D.'s explanation of her subsequent conduct—that she was in shock, wanted to pretend the rape did not happen, and sought contact with defendant to assure herself that he was not a "bad guy" or a rapist—was not inherently incredible.  The rape trauma expert informed the jury that there is no standard response to trauma, and that victims of acquaintance rape have a more difficult time acknowledging they have been raped and tend to minimize or deny the incident.  In light of this testimony, the jury could infer that P.D.'s conduct, even if counterintuitive, was not inconsistent with her rape allegation.

Defendant, in essence, asks us to redetermine the issue of credibility and draw from P.D.'s testimony inferences favorable to himself.  We cannot do that.  (See *People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206; *People v. Ennis*, *supra*, 190 Cal.App.4th at p. 732.)

II

Defendant challenges the adequacy of two jury instructions: on rape trauma and on prior consensual sexual intercourse.  The adequacy of jury instructions is subject to de novo review.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1217.)

*A.  Rape Trauma Instruction*

The jury was instructed with CALCRIM No. 1192 that "testimony about rape trauma is not evidence that the defendant committed any of the crimes charged against him.  [¶] You may consider this evidence only in deciding whether or not an alleged rape victim's conduct was not inconsistent with the conduct of someone who has been raped,

7

and in evaluating the believability of her testimony." Defendant argues this jury instruction misstates the law because rape trauma testimony is not admissible to support the complaining witness's credibility.

Under *People v. Bledsoe* (1984) 36 Cal.3d 236, expert testimony about rape trauma syndrome is admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247–248.) In cases where the defendant suggests "that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped," such testimony may be introduced to rebut this inference "by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Id.* at p. 247.) However, expert testimony may not be used to suggest that, because a complaining witness suffers from rape trauma syndrome, the witness must have been raped. (*Id.* at p. 251.)

This reasoning was extended to the use of expert testimony on child sexual abuse accommodation syndrome. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 391–394.) Thus, psychological testimony was held admissible to rehabilitate the credibility of a child who had retracted her molestation claim. (*People v. Housley* (1992) 6 Cal.App.4th 947, 956.) But to avoid prejudice to the defendant "in the event such evidence is misused," courts were required to give a sua sponte limiting instruction that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at pp. 958–959.)

Defendant acknowledges that CALCRIM No. 1192 properly instructed the jury not to consider the rape trauma testimony as evidence that a rape actually occurred. But he contends that by allowing the jury to consider this evidence in evaluating the complaining witness's credibility, the instruction effectively "permits the jurors to

consider the expert testimony as supportive of the truth of the allegations made against the defendant." We disagree.

Rehabilitating a rape victim's credibility against unfavorable inferences based on popular misconceptions is meant to level the playing field and help jurors evaluate a victim's credibility objectively. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) Defendant conflates this permissible use of expert testimony with impermissible bolstering of a victim's credibility about the rape allegations. CALCRIM No. 1192 clearly limits the latter use, while allowing the former. As the court noted in *People v. Housley*, *supra*, 6 Cal.App.4th 947, the danger of misusing an expert's testimony does not exist where the expert testifies in general terms, and describes "behavior common to abused victims as a class, rather than any individual victim." (*Id*. at p. 959.) The expert in this case testified about rape trauma in general terms. She did not opine that any of the complaining witnesses suffered from rape trauma syndrome, or that because they suffered from that syndrome, they must have been raped.

It is unlikely that, as instructed, the jury used the expert's general testimony about rape trauma for any purpose other than to evaluate objectively the complaining witnesses' credibility. We find no instructional error.

### B. Instruction on Prior Consensual Sexual Intercourse

Defendant challenges the court's failure to include P.D. in CALCRIM No. 1194. The form jury instruction states: "You have heard evidence that (<insert name of complaining witness>/Jane Doe/John Doe) had consensual sexual intercourse with the defendant before the act that is charged in this case. You may consider this evidence only to help you decide (whether the alleged victim consented to the charged act[s]/[and] whether the defendant reasonably and in good faith believed that (<insert name of complaining witness>/Jane Doe/John Doe) consented to the charged act[s]). Do not consider this evidence for any other purpose."

The prosecutor argued that this instruction applies only to undisputed evidence that a victim had prior consensual sexual intercourse with defendant. The court agreed and modified CALCRIM No. 1194 to read as follows: "You have heard undisputed

9

evidence that J.T. and F.M. [another alleged victim] had consensual sexual intercourse with the defendant before the act that is charged in this case. You may consider this evidence only to help you decide whether the alleged victim consented to the charged acts and whether the defendant reasonably and in good faith believed that J.T. and F.M. consented to the charged acts. Do not consider this evidence for any other purpose." Since P.D. disputed defendant's testimony that they had only consensual sex, she was not included in the instruction.

CALCRIM No. 1194 derives from section 1127d, subdivision (a), which requires a limiting instruction "if evidence was received that the victim consented to and did engage in sexual intercourse with the defendant on one or more occasions prior to that charged against the defendant in this case . . . ." Neither the statute nor CALCRIM No. 1194 require that the evidence be undisputed. In the same vein, the older jury instruction on this subject, CALJIC No. 10.61.1, expressly admonished jurors that they should consider the evidence of prior consensual sexual intercourse for its limited purpose only if they believed it.

The People effectively concede the trial court erred in modifying the instruction to apply only to undisputed evidence. They argue instead that defendant's testimony about having consensual "sex" with P.D. before the charged crime was too vague to establish the two had had "sexual intercourse." Assuming defendant's testimony constituted substantial evidence supporting the inclusion of P.D. in CALCRIM No. 1194, we nevertheless agree the error was harmless because it is not reasonably probable that defendant would have obtained a more favorable result had P.D. been included in the instruction. (See *People v. Perez* (1987) 194 Cal.App.3d 525, 530, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant argues that the failure to include P.D. in CALCRIM No. 1194 sent a message to the jury that defendant's testimony about having had prior consensual sex with P.D. was not credible. But the court did not strike defendant's testimony, and the jury was free to consider it. The jury was admonished that it should not draw factual suggestions from particular instructions, that it alone should judge the witnesses'

credibility, and that it could choose to believe all, part or none of any witness's testimony.

In arguments to the jury, neither side highlighted the exclusion of P.D. from CALCRIM No. 1194. Defense counsel argued in closing that defendant's testimony was credible while P.D.'s rape claim bordered on the absurd. In rebuttal, the prosecutor challenged defendant's claim that he had only consensual sex with P.D. by emphasizing actions that showed his use of force and her lack of consent during the alleged rape itself—that defendant pinned P.D. down so that she could not move and that she tried to hold up her underwear with one hand.

Section 1127d, from which CALCRIM No. 1194 derives, sets limits on the use of evidence of prior sexual activity because it was enacted to counter the notion that an "unchaste woman" was more likely to have consented to sexual intercourse with the defendant. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 222 (Arabian, J., concurring).) It does not require the jury to infer consent from prior conduct regardless of evidence to the contrary. Thus, whether or not the jury believed defendant had had consensual sex with P.D. on prior occasions, it still needed to determine if the evidence supported an inference that she consented on the occasion giving rise to the charge against defendant.

The jury also was instructed with CALCRIM No. 1000 that a woman may withdraw her consent: "A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] 1. She communicated to the defendant that she objected to the act of intercourse and attempted to stop the act; [¶] 2. She communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] AND 3. The defendant forcibly continued the act of intercourse despite her objection." Since the jury was instructed P.D. could withdraw her consent at any time, and her actions reasonably indicated lack of consent at the time of the charged offense, the jury could find defendant guilty of raping P.D. on the

11

particular occasion, whether or not it believed P.D. had engaged in prior consensual sexual intercourse with him.

Any instructional error as to P.D. was also harmless because the jury found defendant guilty of assault with intent to commit rape as to J.T., even though she was included in CALCRIM No. 1194. That verdict indicates the evidence of prior consensual sexual intercourse was not determinative. Defendant's suggestion that his acquittal of the rape charge as to J.T. had something to do with her inclusion in CALCRIM No. 1194 is not well taken. The acquittal of the greater offense was due to the uncertainty in J.T.'s testimony regarding penetration and had nothing to do with the issue of consent.

We find no instructional error requiring reversal.

### III

A friend of J.T.'s was allowed to testify over a hearsay objection that J.T. told him her "dance instructor" had "pinned her down and forced himself onto her." Defendant argues the testimony regarding the identity of J.T.'s assailant and the details of the assault exceeded the scope of the fresh complaint doctrine, under which it was admitted.

Historically, the fresh complaint doctrine allowed admission of evidence that a victim of a sexual offense had promptly complained. The doctrine was based on the assumption that "'[i]t is natural to expect that the victim of a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur.'" (*People v. Brown* (1994) 8 Cal.4th 746, 756, quoting *People v. Burton* (1961) 55 Cal.2d 328, 351.) Although this assumption has been discredited, evidence may still be admitted "for the *nonhearsay* purpose of establishing the circumstances under which the victim reported the offense to others . . . ." (*People v. Brown*, at pp. 759–760.) The evidence "should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose." (*Id.* at p. 763.) That includes evidence "demonstrating that the complaint "'*related to the matter being inquired into, and* [*was*] *not a complaint wholly foreign to the subject* . . . .'"'" (*Id.* at p. 756, citing *People v. Burton*, at p. 351.) Stating "the nature of the offense and the identity of the asserted offender, without details, is proper." (*Ibid.*)

12

The challenged testimony identified defendant, J.T.'s "dance instructor," as the person who pinned her down and "forced himself onto her," a euphemistic way of saying he perpetrated a forcible sexual act, possibly rape. This limited testimony does not appear to exceed the scope of the fresh complaint doctrine. In any event, the trial court would have been required to instruct the jury on the limited non-hearsay purpose for which it was admitted, had such a request been made. (*People v. Manning* (2008) 165 Cal.App.4th 870, 880.) We have not been cited to a place in the record where a request for a limiting instruction was made with regard to this evidence, or where the jury was instructed that the evidence should not be considered for its truth.

Any error with regard to the admission of this evidence was undoubtedly harmless since J.T. testified at trial, and her extrajudicial statements to her friend were simply cumulative. It is not reasonably probable that a different result would have occurred had those statements been excluded or properly limited. (See *People v. Manning*, *supra*, 165 Cal.App.4th at p. 881 [failure to give limiting instruction is harmless error where victim testified at trial]; *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526 [admission of hearsay statements is harmless error where declarant testified at trial].)

IV

Defendant argues the trial court abused its discretion and violated his right to due process in denying his request to continue the trial to allow the testimony of Alien Ramirez, his girlfriend at the time of his alleged assault on J.T. In related arguments, defendant contends that the error deprived him of his right to present a defense and to confront witnesses, and that his counsel was ineffective in failing to present the issue sufficiently to the trial court.

"A continuance in a criminal case may be granted only for good cause. (§ 1050, subd. (e).) Whether good cause exists is a question for the trial court's discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) The court must consider '""not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether

13

substantial justice will be accomplished or defeated by a granting of the motion.'"" (*Ibid.*)" (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

When a defendant seeks a continuance to secure a witness's testimony, the defendant has the burden of showing he or she "'exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.' [Citations.]" (*Jensen v. Superior Court* (2008) 160 Cal.App.4th 266, 270.) "When a witness is not under subpoena, his or her absence generally does not constitute good cause for the continuance of a trial [citations][.]" (*Id.* at p. 271; see also *Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 17–18.)

We review the denial of a motion for a continuance for abuse of discretion and consider whether it is so arbitrary as to deny due process. (*People v. Riccardi* (2012) 54 Cal.4th 758, 834; *People v. Doolin*, *supra*, 45 Cal.4th at p. 450.) Not every denial of a request for a continuance violates due process, "even if the party seeking the continuance thereby fails to offer evidence. [Citation.]" (*People v. Beames* (2007) 40 Cal.4th 907, 921.) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal. [Citation.]" (*People v. Doolin*, at p. 450.)

As to the related claim of ineffective assistance of counsel, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Defendant's first trial ended in a mistrial in April 2011, when his attorney became suddenly unavailable due to a personal tragedy. Jury selection in the retrial began on August 24, 2011. On that day, defense counsel advised the court that Ramirez was not in California and would be outside the United States between September 2 and 12. He represented she was under subpoena on call to him, but had not responded to his messages whether she could testify before September 2. Counsel suggested Ramirez

14

would be available on September 13.  The court responded that would be outside the three-week estimate given the jurors.

Counsel renewed the request for a continuance on September 1, and the court reiterated it would not be granted.  On September 7, counsel yet again requested a two-day break in the trial to allow Ramirez to testify on September 13.  In denying the request, the court noted counsel had not proven Ramirez had ignored a subpoena when she left the jurisdiction.  Counsel responded that was correct.  Presentation of the evidence ended on September 8, followed by closing arguments on September 9.  Deliberations started on September 12.

On this record, we cannot conclude the court abused its discretion in denying the continuance.  Even though counsel asked for a delay of only two court days, the record does not indicate Ramirez was under subpoena when she left California and it is unclear whether counsel had made diligent efforts to obtain her presence at trial before she left the jurisdiction.  Additionally, the court had no way of judging the likely benefit to defendant from her expected testimony since counsel apparently made no offer of proof until the hearing on the motion for a new trial.  Even then, counsel stated in general terms that Ramirez "would have testified about events in this case that were inconsistent with what the girls said and would have also testified about [defendant]'s character, having dated him so long."  Counsel referenced a declaration that contained this offer of proof, but the declaration is not attached to the motion for a new trial included in the record on appeal.  The representations counsel made do not make clear whether the inconsistencies to which Ramirez would have testified were material to the convictions from which defendant appeals.

Defendant argues Ramirez would have corroborated his testimony that he took J.T. to other people's apartments because he was in a relationship with Ramirez.  Ramirez also would have confirmed her presence at a club at which J.T. arrived uninvited the night after defendant and J.T. had consensual sex for the second time.  This, he claims, would have supported the defense's theory that J.T. was angry at defendant because of his relationship with Ramirez.

15

The fact that defendant and Ramirez were in a relationship was not disputed, nor was Ramirez's presence at the club on the night in question. Defendant testified Ramirez and he were dance partners; they also taught salsa classes together, and they argued about a routine in front of other people at the club. J.T. similarly testified defendant argued with his "dance partner" in front of everybody at the club, and the relationship between the two appeared to be romantic. Her testimony was consistent with defendant's in all respects except she believed defendant had invited her to the club, and he denied that. J.T. testified she was upset because she had to stand in line at the club and defendant did not pay any attention to her that night. The trial testimony does not indicate Ramirez had any personal knowledge of the facts underlying J.T.'s allegations against defendant or would have added anything material to his defense.

Additionally, the defense called a number of character witnesses, who testified women flirted with defendant at clubs, and he dated a lot of women. Women who had long-term consensual sexual relationships with defendant testified he did not force them to have sex when they did not want to have it. Other women testified that defendant made no sexual advances towards them, or that he more or less respected their wishes when they rejected his advances. In light of the ample character evidence presented by the defense, Ramirez's testimony regarding her sexual relationship with defendant most likely would have been cumulative.

We see no abuse of discretion or ineffective assistance of counsel resulting in prejudice to defendant from the denial of his request for a continuance.

V

Defendant also argues the trial court abused its discretion in failing to remove a sleeping juror, thus depriving defendant of due process and a fair trial. In a related argument, he contends counsel was ineffective in failing to request that the juror be removed.

When it has notice that a juror is sleeping during trial, the trial court must conduct an investigation. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) The scope of the

investigation and the decision whether to discharge the juror are reviewed for abuse of discretion. (*Ibid*.)

In *People v. Bonilla*, *supra*, 41 Cal.4th 313, a juror notified the court he had "drifted off to sleep a couple of times" during trial. (*Id*. at pp.350–351.) The court held a hearing at which the juror explained he had caught himself nodding off but did not believe he had missed anything. (*Id*. at pp. 351–352.) After holding an additional hearing at which no evidence indicating an ongoing problem with the juror was adduced, the court denied the defendants' motion to dismiss the juror. (*Id*. at p. 352) The Supreme Court found no abuse of discretion. (*Ibid*.)

In *People v. Bradford* (1997) 15 Cal.4th 1229, the trial court and defense counsel commented that a juror was asleep on two days of trial. (*Id*. at p. 1348) The Supreme Court concluded the trial court did not abuse its discretion in not investigating further without evidence of "the juror's inattentiveness over a more substantial period." (*Id*. at p. 1349.) It noted that courts generally are reluctant to find juror misconduct based on inattentiveness without evidence that a juror slept during material portions of trial. (*Ibid*.)

Here, during the first week of trial, the court advised counsel of its concern that Juror No. 10 may have fallen asleep "at various times." At one point, he appeared to be snoring, then suddenly looked up when nudged by Juror No. 11. For the most part, however, the court was unsure whether Juror No. 10 was sleeping or listening with his eyes closed. The prosecutor and defense counsel were not sure either. Defense counsel advised the court that, even though the juror had sat with his eyes closed during jury selection, he appeared to be listening. The court asked counsel to "pay a little attention . . . and just see if anything seems obvious."

During deliberations, Juror No. 11 sent a note to the court complaining, among other things, that Juror No. 10 "fell asleep many times during the trial, did not pay full attention to the trial process. I had to pat his shoulder to wake him up. Juror No. 6 also noticed that." The court questioned Juror No.10, who admitted to closing his eyes, but claimed he prevented himself from falling asleep by chewing on peanuts and had "fully understood and heard the case." The court noted that after its initial concern that Juror

17

No. 10 may be sleeping during trial, it watched him carefully and did not notice any further problem.

We find no abuse of discretion or ineffective assistance of counsel under these circumstances. The trial court itself had watched Juror No. 10 and had noticed no ongoing problem. The juror maintained he had taken measures to stay alert during trial and had been "pretty much aware of what was going on." Defense counsel also had observed that despite closing his eyes, the juror appeared to be paying attention. There was no evidence that Juror No. 10 had actually missed substantial or material portions of trial. Counsel was not required to request that Juror No. 10 be removed in the absence of such evidence, and the court's handling of the matter was within its discretion.

VI

The court instructed the jury with CALCRIM No. 1191 on the use of propensity evidence admitted pursuant to Evidence Code section 1108. Defendant argues the jury instruction violated his right of due process because it deprived him of the presumption of innocence and the right to have his guilt determined beyond a reasonable doubt. In a related argument, he contends Evidence Code section 1108 itself violates the right to due process and equal protection. Defendant concedes he challenges settled California precedent in order to preserve the issues for possible review in federal court. We reject these arguments.

A. *CALCRIM No. 1191*

The court instructed the jury with CALCRIM No. 1191 that if the uncharged rape of S.L. was proven by preponderance of the evidence, the jury was allowed, but not required, to conclude that defendant was disposed to commit sexual offenses. From that, the jury was allowed to conclude further that defendant was likely to commit and committed the offenses with which he was charged. The jury was admonished the uncharged offense was to be considered as a factor with other evidence but not as evidence of guilt by itself. The jury also was admonished the People had to prove the elements of every charge beyond a reasonable doubt.

18

As defendant concedes, in *People v. Reliford* (2003) 29 Cal.4th 1007, the Supreme Court upheld the older instruction on the use of propensity evidence, CALJIC No. 2.50.01, against a due process challenge. (*Id*. at pp. 1012–1016 [holding instruction unlikely to mislead jury regarding prosecution's burden to prove elements of charged crimes beyond reasonable doubt].) Subsequent cases have held that CALCRIM No. 1191 is not materially different from CALJIC No. 2.50.01. (See, e.g., *People v. Anderson* (2012) 208 Cal.App.4th 851, 894–896; *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87; *People v. Cromp* (2007) 153 Cal.App.4th 476, 480.)

Defendant argues that inferring a defendant's disposition to commit sexual offenses, as permitted by CALJIC No. 2.50.01, is materially different from concluding the same thing, as permitted by CALCRIM No. 1191. He argues further that this one-word difference in the instructions deprived him of the presumption of innocence. We disagree. Despite defendant's assertion that "conclude" is "a more definitive term," a conclusion and an inference are functional synonyms. A conclusion of fact is "an evidentiary inference," and an inference is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." (See Black's Law Dict. (9th ed. 2009) pp. 329, col. 2 & 847, col. 2.) CALCRIM No. 1191 and CALJIC No. 2.50.01 are not materially different.

We are bound by the Supreme Court's holding in *People v. Reliford*, *supra*, 29 Cal.4th 1007, under principles of stare decisis. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B. Evidence Code Section 1108

Evidence Code section 1108, subdivision (a) makes evidence of a defendant's commission of a sexual offense admissible in a criminal prosecution of the defendant for another sexual offense, subject to the balancing of probative value and undue prejudice under Evidence Code section 352. In *People v. Fitch* (1997) 55 Cal.App.4th 172, 182–184, the Court of Appeal held that section 1108 does not violate equal protection. That holding was cited with approval in *People v. Falsetta* (1999) 21 Cal.4th 903, where the Supreme Court held that section 1108 does not violate due process because it allows trial

19

courts to exclude unduly prejudicial evidence under section 352. (*Id.* at p. 917–918, 919.)

Defendant contends the state precedent should be reconsidered in light of *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, overruled on other grounds by *Woodford v. Garceau* (2003) 538 U.S. 202. We are not persuaded. As defendant acknowledges, decisions of the federal intermediate courts are not binding on us. (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) But we are bound by *People v. Falsetta*, *supra*, 21 Cal.4th 903. (See *Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.) As defendant also acknowledges, *Garceau v. Woodford* involved the introduction of propensity evidence in a capital murder case. The Ninth Circuit in that case was not faced with a constitutional challenge to Evidence Code section 1108, and the case cannot stand for a proposition not actually considered. (See *People v. Barragan* (2004) 32 Cal.4th 236, 243.) The Ninth Circuit has upheld the admission of propensity evidence in sex offense cases both under Evidence Code section 1108 and its rough analogue, Federal Rule of Evidence 414. (See *Mejia v. Garcia* (9th Cir. 2008) 534 F.3d 1036, 1047; *United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022, 1031.) We see no conflict between *Garceau v. Woodford* and these sex offense cases. Even were there a conflict in Ninth Circuit decisions, it is not for us to resolve.

Not only does defendant urge us to disagree with binding precedent, but he cannot show prejudice. Since the jury could not reach a verdict on at least some of the charges, it cannot be said that the uncharged rape of S.L., which was the sole subject of CALCRIM No. 1191, determined the result of his trial.

VII

Defendant urges us to find cumulative error based on the issues we discussed so far. Since we find no individual error requiring reversal of his convictions, we also reject his claim of cumulative error. (See *People v. Panah* (2005) 35 Cal.4th 395, 479–480 [error harmless when considered separately do not give rise to cumulative error].)

20

## VIII

Defendant argues that the $2,000 restitution fine under section 1202.4, subdivision (b) violated his federal constitutional rights because the fine is punitive and the court imposed it on judicially determined facts.  This argument was recently rejected in *People v. Kramis* (2012) 209 Cal.App.4th 346.

As the court in that case explained, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*People v. Kramis*, *supra*, 209 Cal.App.4th at p. 350, quoting *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)  This requirement applies to the imposition of criminal fines as well. (*Southern Union Co. v. United States* (2012) 567 U.S. \_\_\_, 132 S.Ct. 2344, 2357.)  However, it has no application in cases where the trial court exercises its discretion by imposing a sentence within a statutory range.  (See *People v. Kramis*, at p. 351 and cases cited there.)  A sentence within such a range is supported by the jury's verdict, and any factor the trial court uses to determine the precise sentence within the range is not a sentence enhancement.  (*Ibid*.)

The statutory range set forth for a fine in a felony conviction in section 1202.4, subdivision (b)(1) used to be between $200 and $10,000.  (See *People v. Kramis*, *supra*, 209 Cal.App.4th at p. 349.)  Since January 1, 2012, it has been between $240 and $10,000.  (*Id*. at p. 350, fn. 2.)  Defendant was sentenced on January 27, 2012 for crimes committed in 2002 and 2009.  The $2,000 fine is within the statutory limit under either version of the statute.

Defendant argues that, under section 1202.4, subdivision (c), the applicable statutory maximum was $200 because the court was to determine his ability to pay if it decided to impose a fine in a higher amount.  That is contrary to the plain language of subdivision (c), which refers to a "minimum" fine.  A defendant's ability to pay is one factor, among others, that the court considers in setting the amount of the fine above the statutory minimum but within the statutory range.  (See *People v. Kramis*, *supra*, 209 Cal.App.4th at p. 350, citing § 1202.4, subds. (c)–(d).)  Since no factor enhanced the fine

21

beyond the statutory maximum authorized by the jury verdict, *Apprendi v. New Jersey*, *supra*, 530 U.S. 466 and its progeny have no application in this case.

IX

Defendant argues the court abused its discretion in denying his motion for a new trial based on jury misconduct, without holding an evidentiary hearing or ordering disclosure of juror identifying information.

A petition for release of juror identifying information must be supported "by a declaration that includes facts sufficient to establish good cause for the release" of this information. Denial of such a petition is reviewed for abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

The trial court also has discretion "to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] . . . 'The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citations.]" (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

The trial court has broad discretion "to act upon a motion for new trial. [Citation.] When the motion is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial." (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

As we noted, on the second day of deliberations, Juror No. 11 sent a note to the court, complaining that Juror No. 10 slept during trial. He also complained Juror Nos. 8 and 10 were biased in defendant's favor based on their personal experiences. Because of this perceived bias, on the third day of deliberations, Juror No. 11 asked to be dismissed from the jury, stating he had doubts Juror Nos. 8 and 10 "will change their biased mindset about the case which was openly pronounced in the deliberation room, due to their

22

personal experiences." Juror No. 11 assured the court he took jury duty seriously and wanted to do "a good job as a juror," but did not want to participate in a "task" that was "likely to fail . . . justice." The court questioned Juror No. 10 about the allegations against him, and admonished him to decide the case on the evidence. The court also admonished Juror No. 11 that disagreement with other jurors was not a ground to withdraw from his position as a juror.

Defendant's motion for a new trial was based on a declaration by Juror No. 10, whom Juror No. 11 had earlier accused of bias. In the declaration, Juror No. 10 alleged that, after the prosecutor rested, Juror No. 11 told him that when they go back into the jury room, "'in five minutes we're done.'" Juror No. 10 also claimed that, when deliberations began, Juror No. 11 immediately stated defendant was guilty, but "never" gave a reason for his opinion. Juror No. 10 alleged further that, one day during deliberations, Juror No. 9 came into the jury room crying. She told the jury, "We need to get this guy off the street," and always voted to convict defendant.

The trial court denied the motion for a new trial and declined to release juror identification information, finding defendant had not made a prima facie case of juror misconduct or prejudice. The court noted the jury deliberated for several days, the court and counsel addressed issues that came up during deliberations, and defendant could not "pick through [the] whole deliberative process."

A. *Juror No. 11*

Defendant relies on *People v. Brown* (1976) 61 Cal.App.3d 476 to argue that Juror No. 11 committed misconduct. In that case, a juror signed a declaration, stating that, before the prosecution rested, a fellow juror had commented, ""He is guilty." "There is no doubt about it.'"" (*Id*. at p. 479) Based on that uncontradicted declaration, the appellate court found the juror who made the comments engaged in prejudicial misconduct by prejudging the case "early in the proceedings independent of the evidence and the law." (*Id*. at p. 482.)

Defendant also relies on *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, where one juror was alleged to have told another, ""I made up my mind already.

23

I'm not going to listen to the rest of the stupid argument.'"" (*Id*. at p. 784.) The trial court granted a motion for new trial based on juror misconduct, finding this remark was made two weeks into a five-week trial. (*Id*. at p. 795.) The Court of Appeal affirmed, stating the juror's remark "requires neither interpretation nor the drawing of inferences. It is a flat, unadorned statement that this juror prejudged the case long before deliberations began and while a great deal more evidence had yet to be admitted." (*Id*. at p. 794.)

The People in turn rely on *People v. Allen and Johnson* (2011) 53 Cal.4th 60. There, the Supreme Court concluded that a remark a juror made during deliberations, "'When the prosecution rested, she didn't have a case,'" was "subject to some interpretation" and was "not an 'unadorned statement' that he had conclusively prejudged the case." (*Id*. at pp. 66, 73.) The court reasoned that "[a] juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*Id*. at p. 73.)

The record in this case is somewhat unclear whether the court credited Juror No. 10's allegation that Juror No. 11 had prejudged the case. The court stated tentatively that "maybe there is a suggestion . . . maybe there was some comment . . . who knows what was said." Considering that Juror No. 11 already had accused Juror No. 10 of bias during deliberations, the court could rightfully suspect Juror No. 10's counter-accusation.

Assuming that the court credited the declaration, the remark, "when we go back into the jury room 'in five minutes we're done,'" does not unequivocally show that, by the end of the prosecution's case, Juror No. 11 had decided defendant was guilty beyond any doubt and was refusing to listen to the defense's case. Since the remark required some interpretation, it was closer to the statement at issue in *People v. Allen and Johnson* than to those in *Grobeson v. City of Los Angeles* and *People v. Brown*.

Juror No. 10 also claimed Juror No. 11 announced his belief in defendant's guilt on the first day of deliberations without providing a reason for that belief. But the declaration does not establish that Juror No. 11 refused to listen to the opinions of other jurors or to consider the evidence and instructions. (See *People v. Allen and Johnson*,

24

*supra*, 53 Cal.4th at p. 73.)  On the contrary, Juror No. 11's complaints during deliberations suggest that he listened to Juror Nos. 8 and 10's views and disagreed with them because he perceived them to be based inappropriately on those jurors' personal experiences rather than on the evidence.  Whether or not that perception was correct, Juror No. 11 apparently was trying to follow the instruction that the case should be decided on the evidence presented at trial.

### B.  *Juror No. 9*

Defendant argues the allegations that Juror No. 9 cried at one point during deliberations and told the other jurors, "We need to get this guy off the street," presented good cause for granting the motion for a new trial.  Defendant is correct that "both trial-related and non-trial-related stress can provide good cause for discharging a juror." (*People v. Diaz* (2002) 95 Cal.App.4th 695, 703 and cases cited in it.)  But the question is whether the stress interferes with a juror's ability to perform as a juror.  (*Ibid*.)

In two of the cases on which defendant relies, the juror herself brought her inability to perform as a juror to the court's attention.  (See *People v. Collins* (1976) 17 Cal.3d 687, 690) [juror asked to be excused because she could not follow court's instructions, "felt more emotionally than intellectually involved and . . . thought she would not be able to make a decision based on the evidence or the law"], disapproved on a different ground in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19; *People v. Van Houten* (1980) 113 Cal.App.3d 280, 285 [juror asked to be excused because evidence was so graphic and upsetting to her she tuned it out].)  In *People v. Diaz*, *supra*, 95 Cal.App.4th 695, the foreperson alerted the court that a juror was refusing to deliberate. (*Id*. at p. 700.)  Although the juror's emotional distress became apparent in subsequent questioning, it was not the sole or primary basis for removing her.  (*Id*. at pp. 702, 705.)

Here, there is no evidence Juror No. 9 was unwilling or unable to deliberate, follow instructions, or assess the evidence rationally.  Rather, defendant infers from the allegation that the juror had become emotional on one occasion during several days of deliberation that she generally could not perform as a juror.  The inference is speculative absent other evidence.  The juror's alleged comment that defendant should be taken "off

25

the street" and her consistent vote to convict may suggest she strongly believed he was guilty, but they do not demonstrate that her belief was the result of an emotional reaction as opposed to deliberation and rational examination of law and evidence.

The trial court reasonably concluded that Juror No. 10's declaration failed to establish juror misconduct. In light of that conclusion, the court did not abuse its discretion in denying the motion for a new trial without releasing juror information or holding an evidentiary hearing.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


MANELLA, J.


SUZUKAWA, J.